**John C. and Thelma R. CARLISTO, Appellants,**

v.

**GENERAL MOTORS CORPORATION, Respondent.**

**No. WD 48106.**

Missouri Court of Appeals,
Western District.

March 1, 1994.

Michael W. Manners, Independence, for appellants.

Rodney Earl Loomer, Springfield, for respondent.

Before SMART, P.J., and LOWENSTEIN and FENNER, JJ.

FENNER, Judge.

Appellants, John C. Carlisto, Jr. and Thelma R. Carlisto, appeal the order of summary judgment entered in favor of respondent, General Motors Corporation (GM). The underlying action is based on injuries that John sustained while driving a motor home that was custom built on a chassis manufactured by GM.[1] The motor home had a problem with the fuel system that resulted in fuel starvation, and John's injuries stemmed from having to pump the accelerator continuously to keep the engine from stalling.

Appellants filed a petition for damages on February 28, 1991, naming as defendants GM, Motor Homes, Inc., and Molle Chevrolet, Inc.[2] In their petition, appellants alleged that on December 19, 1988, Motor Homes, Inc. sold a 1989 Space Craft Motor Home to appellants which was custom manufactured by Motor Homes, Inc. in Concordia, Missouri on a Chevrolet chassis. Chevrolet is a division of GM. GM sold the Chevrolet chassis (otherwise known as the "P" chassis) to Molle Chevrolet, Inc. who, in turn, sold the chassis to Motor Homes, Inc. Although Motor Homes, Inc. purchased the chassis from Molle Chevrolet, Inc., it was shipped directly from GM to Motor Homes, Inc. Motor Homes, Inc., using the Chevrolet (GM) chassis, assembled the motor home in question and later sold it to appellants. The chassis in question is an incomplete vehicle chassis which is shipped in an unassembled state to be assembled by a body builder for use as a commercial unit, small mini-bus, or motor home.

Appellants received the motor home on December 20, 1988 in Arizona. Appellants alleged that on April 24, 1989, they began driving from Arizona to Concordia, Missouri to have some warranty work done on the motor home. En route, while still in Arizona, appellants encountered fuel problems which made the vehicle difficult to operate. Specifically, John had to pump the accelerator with his foot continuously to keep the engine running. Appellants took the vehicle in for repairs, but the problem continued as they drove on through New Mexico, Kansas, and until they reached Concordia, Missouri. They took the vehicle in for more repairs while en route to Missouri. Before reaching Wichita, Kansas, John developed a large blister on his foot for which he sought medical attention. He alleged that it was caused by his having to pump the accelerator continuously from Arizona to Concordia, Missouri.

Appellants alleged that the problems in the engine were caused by the fact that the motor home did not have a fuel relay switch. They alleged that such fuel relay switch was required by the design of the motor home. Further, they alleged that the failure of the motor home to have a fuel relay switch made it necessary that John continuously pump the accelerator of the motor home, and caused the blister to form on his foot.

Appellants alleged that GM designed, manufactured, and sold the engine and chassis for the motor home and placed them in the stream of commerce where they were subsequently incorporated into the motor home that appellants purchased. Motor Homes, Inc. installed the engine and chassis into the motor home body. Appellants alleged that the "motor home was in a defective condition, unreasonably dangerous, when put to a reasonably foreseeable use at the time that it was sold and left possession of Defendants in that it had no fuel relay switch which necessitated Plaintiff, John C. Carlisto, Jr., to continuously pump the accelerator on said motor home, thereby causing injury to his foot."[3]

---

1. Thelma is John's wife, and her claim was for loss of consortium as a result of the injuries her husband sustained while driving the motor home in question.

2. Molle Chevrolet was dismissed from the case because it merely sold the chassis. § 537.762, RSMo Supp.1993. On July 9, 1993, appellants dismissed their claim against Motor Homes, Inc. without prejudice, pursuant to Rule 67.01.

3. As to his injuries, John alleges that he sustained a blood blister on his foot as a result of his having to pump the accelerator of the motor home continuously from Arizona to Missouri. Because he is a diabetic, John apparently had reduced sensation in his feet and would not have been able to feel pain in his foot from pumping the accelerator. John was treated by doctors in Wichita and Concordia for his blister and had surgery on his foot because of complications from the blister.

On June 8, 1992, GM filed a motion for summary judgment. In its motion, GM contended that it was entitled to summary judgment on appellants' strict liability claim because no defective condition existed at the time GM sold the chassis, and that Missouri law provides that a component parts manufacturer cannot be strictly liable for a defect introduced by a third party completing the assembly process. GM contended that appellants' only expert witness, Richard Diklich, had no opinion as to (1) whether the fuel relay switch was supplied with the engine and chassis by GM, and (2) whether the engine and chassis, and any related component parts, were in a defective condition and unreasonably dangerous when sold to Molle Chevrolet. GM contended that the alleged vehicle defects specified by Mr. Diklich relate to the electronic fuel system on the subject vehicle and the failure to connect or properly wire the fuel relay switch. GM stated that there is no evidence that GM failed to supply the fuel relay switch when the engine and chassis were sold to Molle Chevrolet. Finally, GM contended that the evidence indicates that the fuel relay switch was shipped by GM, the fuel relay switch was not defective in any manner when it left GM (and there are no allegations that the fuel relay switch, itself, was defective), and any alleged defect was introduced by the assembler (Motor Homes, Inc.) and its failure to assemble the vehicle properly. GM argued that it was entitled to summary judgment because it could not be liable as a component parts manufacturer where the alleged defect was created by alteration of the product by a third person.

On December 2, 1992, the trial court entered an order granting GM's motion for summary judgment.[4] On June 30, 1993, appellants filed a Motion to Reconsider Entry of Partial Summary Judgment for GM, pursuant to Rule 74.01(b). Appellants' motion was overruled on July 12, 1993. This appeal followed.

On appeal, appellants argue that the trial court erred in granting summary judgment in favor of GM. Appellants contend that although GM claimed that it was not responsible for the failure to install the fuel relay switch, the deposition testimony of John May, an employee at Motor Homes, Inc., demonstrates that there is a question of fact as to whether GM shipped the switch with the chassis in question. Appellants argue that the mere fact that the chassis was a component part does not preclude liability by GM.[5]

When considering appeals from summary judgments, we will review the record in the light most favorable to the party against whom judgment was entered. *ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.* The non-movant is accorded the benefit of all reasonable inferences from the record. *Id.*

 Our review is essentially de novo. *Id.* The propriety of summary judgment is purely an issue of law, and we need not defer to the trial court's order granting summary judgment. *Id.* As the court in *ITT Commercial Finance* stated:

> The burden on a summary judgment movant is to show a right to judgment flowing from facts about which there is no genuine dispute. Summary judgment tests simply for the existence, not the extent, of these genuine disputes. Therefore, where the trial court, in order to grant summary judgment, must overlook material in the record that raises a genuine dispute as to the facts underlying the movant's right to judgment, summary judgment is not proper.

*Id.* at 378. The key to summary judgment is the undisputed right to judgment as a matter

---

4. In its order, the court did not make an express determination that there was "no just reason for delay." Therefore, the order is an interlocutory order subject to revision, pursuant to Rule 74.-01(b).

5. At oral argument in this appeal, GM appeared to argue that even if the fuel relay switch was not shipped, appellants had not plead a cause of action. This argument was not presented to the trial court and is not before us in this appeal.

of law, not simply the absence of a fact question. *Id.* at 380.

When the movant has made the prima facie showing of its right to judgment as a matter of law, as required by Rule 74.04(c), the non-movant must make a response, by affidavits, depositions, answers to interrogatories, or admissions on file, that sets forth specific facts showing that there is a genuine issue for trial. *Id.* at 381; Rule 74.04(e). If the non-movant cannot contradict the showing of the movant, judgment is properly entered against the non-movant because the movant has already established a right to judgment as a matter of law. *ITT Commercial Finance,* 854 S.W.2d at 381.

For purposes of Rule 74.04, a "genuine issue" exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts. *Id.* at 382. A "genuine issue" is a dispute that is real, not merely argumentative, imaginary or frivolous. *Id.* at 382.

In the case at bar, appellants alleged in their petition that the motor home that they purchased from Motor Homes, Inc., which was built on a GM chassis, was in a defective condition, unreasonably dangerous when put to a reasonably foreseeable use at the time that it was sold and left the possession of defendants, in that it did not have a fuel relay switch. The failure of the motor home to have a fuel relay switch caused the fuel problems in the engine of the motor home which made it necessary for appellant John Carlisto to pump the accelerator continuously, thereby causing a blister to form on his foot. The blister caused serious injury to John's foot, and he thereby incurred medical expenses and loss of earnings and wages. Appellants sought damages for injuries allegedly caused by the defective motor home.

GM, in its motion for summary judgment, argued that there was no evidence that GM failed to supply the fuel relay switch when the engine and chassis were sold to Molle Chevrolet (and subsequently to Motor Homes, Inc.), and that no defective condition existed at the time GM sold the chassis.

The defectiveness of a product is measured as of the time the product enters the stream of commerce. *Gomez v. Clark Equipment Co.,* 743 S.W.2d 429, 432 (Mo. App.1987). In order to recover under a products liability theory for an injury caused by an allegedly defective product, a plaintiff must establish each of the following: (1) defendant sold the product in the course of its business; (2) the product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use; (3) the product was used in a manner reasonably anticipated; and (4) plaintiff was damaged as a direct result of such defective condition as existed when the product was sold. *Jasinski v. Ford Motor Co.,* 824 S.W.2d 454, 455 (Mo. App.1992); *Fahy v. Dresser Industries, Inc.,* 740 S.W.2d 635, 637–38 (Mo. banc 1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988). As to this fourth element, the plaintiff must produce evidence that neither he nor any third person has made alterations to the product, which would create a defect that could be the proximate cause of the damages incurred. *Jasinski,* 824 S.W.2d at 455.

In the case at bar, GM manufactured an incomplete vehicle chassis which was sold to Molle Chevrolet along with numerous parts which were to be installed on the vehicle (the motor home in question) when it was assembled, such assembly being performed by Motor Homes, Inc. Under Missouri law, subsequent changes or alterations in a product do not relieve the manufacturer of strict liability if the changes were foreseeable and did not render the product unsafe. *Jarrell v. Fort Worth Steel & Mfg. Co.,* 666 S.W.2d 828, 835 (Mo.App.1984); *Hales v. Green Colonial, Inc.,* 490 F.2d 1015, 1020–21 (8th Cir.1974). Where the evidence is conflicting, it is generally a question for the jury to determine whether the defect is traceable to the time the product left the manufacturing company. *Hales,* 490 F.2d at 1021.

Appellants in the case at bar have shown that there is a genuine issue in dispute, that is, whether GM shipped the fuel relay switch with the chassis in question. The evidence in this regard is conflicting. In other words, the evidence is conflicting as to whether GM

failed to ship the fuel relay switch with the chassis, in which case the defective condition would have originated when the chassis left GM, or whether GM did indeed ship the fuel relay switch with the chassis and Motor Homes, Inc. failed to install it properly, in which case the defective condition would be due to the assembly process.

John Margalski, the general supervisor of production for the chassis in question at GM, stated in an affidavit, on June 3, 1992, that (1) the chassis was shipped with an electronic fuel pump and related parts, (2) the fuel relay switch and all related parts were shipped with the chassis, (3) the fuel relay switch and all component parts shipped with the chassis were not defective in design or manufacture, (4) the method of shipping loose parts, including the fuel relay switch, is customary in the industry, and (5) the chassis and component parts are shipped in an unassembled form because of the numerous modifications made by body builders. The loose parts list relating to the subject chassis indicates that the fuel relay switch was included with the chassis shipment.

John May, an employee of Motor Homes, Inc., is responsible for building the body of the motor homes and attaching it onto a chassis. Mr. May personally built the motor home in question. He stated in his deposition that when the chassis is shipped to Motor Homes, Inc., a wooden box containing loose parts is strapped to the chassis. This wooden box sometimes contains a packing list, but Mr. May does not recall if there was a packing list with the chassis in question. In response to the question as to whether he knew what a fuel relay switch was, Mr. May stated, "Basically. I don't know the workings of them. I don't know as far as anything—you know, as far as what they are, no, in relationship to how they work or what they do." Mr. May stated that he never had any training in auto mechanics or auto electronics. Furthermore, he never had any formal training in integrating a chassis to the body of a motor home; rather, he learned from experience.

Mr. May stated that when the parts came in a wooden box attached to the chassis, he did not formally inventory the parts. When asked if he had ever heard of a fuel relay switch before this lawsuit, Mr. May answered, "As far as the fuel relay, no, because I'm not—I'm not trained in it. I mean, I don't know." Mr. May stated that whenever he had a part that he did not recognize and did not know how to install, he would call Lou Maxon, the service manager at Molle Chevrolet.

In Mr. May's deposition, as is relevant to the receipt of the fuel relay switch, the following colloquy occurred:

Q [counsel for GM]: Now, can you say one way or another whether or not the fuel relay switch was received with the chassis delivered from General Motors?

A [Mr. May]: I can't say.

Q: Can you describe what a fuel relay switch looks like?

A: No.

Q: Do you know whether or not it'd be as big as 4 inches by 6 inches or some other size?

A: No. The only—I learned of a fuel relay switch is when Lou put one on.

Q: When was that?

A: When Mr. Carlisto had come in from out—down south over through the winter.

\* \* \* \* \* \*

Q: Up until that time [that you drove the vehicle out to Arizona], were you aware of the fact that this [fuel] system even had or was supposed to have a fuel relay switch?

A: No.

\* \* \* \* \* \*

Q: Do you know now whose responsibility it was to install a fuel relay switch on this GM chassis?

A: Well, as far as my concern is, to me it ought to be General Motors' thing to have the fuel system done when it comes in. That's my thinking on it.

Q: Okay. At the time did you believe that the fuel system was already—to use your term—"done" and that you didn't need to install anything else in connection with the fuel system?

A: Other than just what that piece of paper that shows the fuel pump is blocked

off and use—using the—you know, the windshield washer bottle as a tank and putting the hose back on and that would finish it out.

\* \* \* \* \* \*

Q: As it relates to the fuel relay switch, did you, in 1988, have an understanding as to whose responsibility it was to install that part on the chassis?

A: Nope.

\* \* \* \* \* \*

Q: In this particular case, however, I think you've testified—I want to make sure that I understand it—you don't recall one way or another whether or not there was a fuel relay switch in this parts box in the Carlisto case?

A: That looked like that? No.

Q: That looked like the brown particle with the fuse and spring?

A: If that's what they're supposed to look like, there was not one in there.

On December 20, 1988, Mr. May delivered the motor home to appellants in Arizona. Mr. May had difficulty keeping the unit running and had made numerous stops to have the vehicle looked at on his way to deliver the vehicle to appellants. The following repairs were made to the vehicle during that trip to Arizona: (1) fuel tank "dropped" and then put back in; (2) fuel filters replaced; and (3) fuel filter taken out of carburetor and "little rubber safety device" on filter thrown away.

John Carlisto stated in his deposition that he and his wife began their trip from Arizona to Missouri on April 24, 1989 to get some warranty work done at Motor Homes, Inc. in Concordia, Missouri. John was the only person who drove during the trip, as his wife could not drive the vehicle. As they approached Flagstaff, Arizona, the engine of the motor home "started to act like it wanted to stall" and seemed to be losing power. John had to pump the accelerator continuously to prevent the vehicle from stalling. In Flagstaff, appellants took the vehicle to Accu–Brake for repairs. Accu–Brake installed a fuel pump in the vehicle (apparently in addition to the one that was already there).

After leaving Flagstaff, the vehicle continued to have the same problem. Upon arriving in Albuquerque, New Mexico, appellants again had the vehicle repaired by American RV Mart. The people at American RV Mart told appellants that the Accu–Brake people in Flagstaff had repaired the vehicle incorrectly. Thus, the repair people at American RV Mart removed the fuel pump installed by Accu–Brake and put in a Holley pump, a much stronger pump, and they moved an existing fuel regulator forward of the pump. They also worked on the carburetor, fixed some air leaks on the air bags, and installed a fan in the driver compartment. After the repairs were completed, appellants took the vehicle on a test drive and the same problem occurred. American RV Mart then thought the problem might be with the carburetor, so the carburetor was reworked. When that did not remedy the problem, American RV Mart adjusted the timing, which seemed to remedy the problem.

However, after leaving Albuquerque, the same problem was back again, and John had to pump the accelerator continuously to keep the vehicle from stalling. Appellants stopped for a night in Wichita and then continued on to Concordia, Missouri. The fuel problem continued from Wichita to Concordia.

Appellants had the chassis serviced at Molle Chevrolet in May of 1989. The mechanic at Molle told John that there was a fuel relay switch missing and he did not know what had happened to it. John was also told that the Holley pump was not necessary, and it was removed. After the mechanic removed the Holley pump and properly connected or installed the fuel relay switch, the fuel starvation problem was finally corrected. Thus, when the chassis was serviced at Molle Chevrolet following appellants' trip from Arizona, it is John's testimony that the fuel relay switch was nonexistent and that he observed the mechanic at Molle install one where it should have been in the first place.

Because the evidence is conflicting as to whether GM included the fuel relay switch among the loose parts when it shipped the chassis to Motor Homes, Inc., summary judgment was not appropriate.

We reverse the trial court's order granting summary judgment in favor of GM, and we remand for trial.

All concur.