**John and Kaye BECKER, Appellant,**

v.

**Carlos J. SETIEN, d/b/a Structural Steel, Respondent,**

**Havens Steel Company, Respondent.**

**No. WD 49453.**

Missouri Court of Appeals,
Western District.

June 13, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 1995.

Application to Transfer Denied
Sept. 19, 1995.

Andrew H. McCue, Kansas City, for appellant.

Brian F. McCallister, Joseph A. Sherman, Kansas City, for respondents.

Before FENNER, C.J., P.J., and HANNA and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

This is a negligence action arising from an accident at the construction site of Southeast Elementary School II construction project (construction project). Plaintiffs John and Kaye Becker have sued Defendants Carlos Setien, d/b/a Structural Steel Contract Services Corporation (Setien) and Havens Steel Company (Havens). Defendants, in accordance with their contract, installed the metal flooring for the gymnasium mechanical room, a room which was suspended from the ceiling of the gymnasium, and made a 3'4" by 4'4" access opening in the floor of the room so as to provide access to the room once it was completed. Once they had completed the floor and built the access opening, Defendants' employees removed the ladder which provided access to the room and vacated the area. They did not cover, guard or barricade the hole itself.

Mr. Becker and his co-employees, in the meantime, had been building the concrete walls for the mechanical room. As the room was located 20 feet above the gymnasium floor, they reached it and built the walls by standing on a scaffolding located just outside where the walls were being built. Shortly after Defendants' men left, and despite a warning about the presence of the hole, Mr. Becker decided to stand inside the room rather than on the scaffolding in order to build the walls. In the course of his work, he fell through the hole and sustained serious injury.

Plaintiffs alleged that Defendants were negligent in vacating the area after completing the flooring without covering, barricading, or otherwise guarding the hole. Plaintiffs also alleged that the failure to barricade violated OSHA regulations and that this provided a separate basis for liability.[1]

Both Defendants Setien and Havens denied Plaintiffs' allegations and asserted the applicability of the doctrine of comparative fault. They claimed that their contracts did not require them to build any barricade or guard around the access opening, and that in any event they had turned control of the mechanical room and access hole back over to the prime contractor before Mr. Becker fell and thus could no longer be held respon-

1. Plaintiffs also alleged failure to warn of the existence of the opening. However, as Plaintiff's position is that Defendants had an *absolute* duty to make the dangerous condition safe, they did not rely below, and do not rely here, upon a failure to warn theory of liability.

sible for injuries resulting to an employee of another subcontractor, such as Mr. Becker. Defendants also argued that the OSHA regulations on which Plaintiffs relied were irrelevant, because they only applied to temporary openings and the opening through which Mr. Becker fell was a permanent, not a temporary, opening.

Setien and Havens each filed independent motions for summary judgment. The trial court at first denied the motions, but on reconsideration and clarification of certain underlying facts, the court granted summary judgment in favor of both Defendants. This appeal followed. We affirm.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

On October 5, 1990, the date of the accident, Mr. Becker was a bricklayer for Lindsey Masonry (Lindsey) working at the construction project site. He had worked as a bricklayer for eight years and had held the status of journeyman bricklayer for four or five years. Lindsey had sub-contracted with D.M. Ward Construction Company (Ward), the prime contractor for the construction project, to construct the walls of the school.

Defendant Setien had signed a subcontract with Ward to fabricate and install the steel elements of the construction project with the exception of the metal roof, deck and bar joints. Because Setien was not physically allowed at the project site,[2] Setien's performance was limited to the fabrication and delivery of the steel. The steel was fabricated at Setien's business location and then delivered to the job site. The installation and erection of the steel delivered to the construction site was completed by Havens, pursuant to a subcontract with Setien.

The architectural and structural drawings for the Gymnasium Mechanical Room & Cooling Tower ("mechanical room") clearly depict an uncovered "access opening" measuring 3'4" × 4' approximately 20 feet above

the gymnasium floor. They did not depict either a barricade or cover for the access opening. It is undisputed that Defendants' contract did not specifically require them to build a cover or barricade for the opening, and that when the building was finally completed, including at the time of summary judgment, the opening had no cover or barricade.[3]

The details of the construction of the hole and of the accident were revealed through the deposition of the plaintiff, Mr. Becker, and through the affidavits of Havens' foreman, John Dietrich, and Havens' Field Superintendent, Robert Wirthman. This evidence revealed that, on the afternoon of October 4, 1990, Plaintiff Becker and the other masons were laying and "striking up" the concrete blocks which were to form the walls to the gymnasium mechanical room. As the room was attached to the ceiling and was 20 feet above the gymnasium floor, in order to reach the location for the walls, Mr. Becker and the other masons stood on a scaffold which had been constructed just outside the location for the walls.

The afternoon of October 4, 1990, was also the day that Havens' employees were to build the metal floor for the gymnasium mechanical room, and to cut the access opening in the roof/floor of the gymnasium mechanical room, as called for by their contract. They put up a ladder through the opening so that they could reach the room to do their work. This was the only access opening to the room. Mr. Dietrich stated, without contradiction, that:

> At no time while Havens was working in this area of the construction project did I observe employees of Lindsay [sic] Masonry or any other trade to be working on the inside of the wall or in the area where work was being performed by Havens. At all times while Havens was at work in this area of the project, the masonry contrac-

---

2. Setien was not permitted at the construction site because he did not employ union workers.

3. In support of their motion for reconsideration of the grant of summary judgment for Defendants, Plaintiffs for the first time pointed out that the mechanical drawing for the room contained

the legend "floor hatch". The drawing then sets out a word which is difficult to read because of the bad quality of the copy provided, but which appears to be "area," at the point where the opening was to be.

tors performed their work from the scaffolding on the outside of the wall.

Plaintiffs offered no opposing evidence. Further, Mr. Becker stated that, while standing on the scaffolding and building the wall from the outside of the room, he saw "the steel guys" use a chain saw to cut the hole for the access opening in the floor of the room on the afternoon of October 4, 1990. He further agreed that he saw the hole without difficulty after it was cut.

Mr. Dietrich stated that, the following morning, October 5, 1990, his men:

> completed the installation of the metal deck work in the area of the mechanical room over the P.E. storage room. On that morning, I advised the prime contractor on the project, D.M. Ward Construction Company, that Havens was about to complete its work in that area.

After Havens' men finished installing the metal deck work in the area of the mechanical room that morning, they vacated the area. Havens did not cover, guard, or barricade the floor opening before it left.[4] However, Mr. Dietrich stated that:

> When we completed our work, and as I was leaving, I warned Mr. Becker and his foreman about the existence of the access opening on the other side of the wall.... I removed the ladder through the access opening which Havens' employees had been using to gain access to the mechanical room to perform their work and that area of the construction project was turned over to the prime contractor to coordinate work with the other trades.

Mr. Becker does not specifically recall the warning by Mr. Dietrich about the hole, but he admits he was fully aware the hole was present and uncovered. Nonetheless, once Havens vacated the area, he and his co-workers decided it would be easier to complete the building of the wall from the inside by standing on the metal deck of the mechanical room itself, rather than on the scaffolding. They therefore moved inside the room. There is no evidence that either Ha-

vens or the prime contractor were aware that Mr. Becker and the others were working from inside the room, nor is there any evidence that they were authorized to do so or that Defendants had any basis on which to anticipate that they would do so.

Mr. Becker testified that he was fully aware of the presence of the hole in the floor of the room. He agreed that he could have but did not either cover the hole himself or ask the prime contractor to do so. Nonetheless, he "struck up" the block for the wall from inside the room. Once he finished his portion of the wall, he decided to walk across the room so he could help his co-worker strike block on another of the walls to the room. To do so, he had to pass by the hole in the floor. He was aware that if he fell into the hole, he could seriously hurt or even kill himself. Therefore, when he got to the place where the hole was, he walked around it and then proceeded to the other wall to help his co-worker.

Mr. Becker stated that he knew where the hole was when he first began working on the other wall, but after he had worked for some time he became intent on his work, and thought the hole was further down the wall than it was, and just stepped backwards into it. He fell approximately 20 feet, sustaining serious injuries.

Mr. Dietrich affied that "Havens had completed its work in the area of the mechanical room over the P.E. storage room prior to the time of John Becker's accident in compliance with the contract drawings and specifications and had vacated that area, returning control of the area to the prime contractor, prior to plaintiff's accident." Similarly, Mr. Wirthman affied that:

> The hole through which plaintiff claims to have fallen was constructed and any work performed in connection therewith by Havens Steel was completed in accordance and compliance with the project specifications and drawings provided to Havens Steel Company, with that work having been completed and Havens Steel's em-

---

4. Havens employees worked the remainder of that day in areas of the construction site other

than the roof/floor area where Mr. Becker fell.

ployees having cleared the area prior to plaintiff's accident.

Plaintiffs deny that Havens turned over the work to the prime contractor or that the prime contractor accepted it prior to the accident. However, they offered no deposition testimony, counter-affidavits, or other evidence to support this claim or to refute Havens' affidavits.

## II. *SUMMARY JUDGMENT STANDARD*

■ The purpose of summary judgment is to permit the trial court to enter judgment without delay in cases in which there is no genuine dispute as to the facts and those facts show the movant's right to judgment as a matter of law. The standard for grant of summary judgment under Rule 74.04 is set out in *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371 (Mo.1993).

■ As *ITT* notes, the propriety of granting summary judgment is purely a question of law. *ITT*, 854 S.W.2d at 376. For this reason, appellate review of the grant of summary judgment is essentially *de novo*, and the appellate court need not defer to the trial court's order. The criteria the appellate and trial courts utilize in considering the propriety of summary judgment are the same. The record will be viewed in the light most favorable to the non-moving party, and the latter will also be accorded the benefit of all reasonable inferences from the record. *Id.; Carlisto v. General Motors Corp.*, 870 S.W.2d 505, 508–09 (Mo.App.1994).

■ Where, as here, the defending party has moved for summary judgment, they may show their entitlement to judgment either: (1) by negating an essential element of plaintiff's claim, (2) by establishing all the elements of an affirmative defense, or (3) by showing that, after an adequate period for discovery, non-movant "has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements." *ITT*, 854 S.W.2d at 381; *Rodgers v. Czamanske*, 862 S.W.2d 453, 457 (Mo.App. 1993). All facts not contradicted are taken as true. *Id.*

■ Only after the movant has made the required showing that no genuine issue of material fact exists does the duty arise for the non-movant to show, by affidavit, deposition, or otherwise, that one or more genuine issues are in dispute. *ITT*, 854 S.W.2d at 381–82; *Rodgers*, 862 S.W.2d at 457–58; *Carlisto*, 870 S.W.2d at 509. A genuine issue exists if there is a dispute that is real, not merely argumentative, imaginary or frivolous. The mere existence of slight doubt, or of an immaterial or frivolous dispute, will not defeat summary judgment. *Id.*

## III. *LEGAL ANALYSIS*

### A. *Plaintiffs Failed To Refute Defendants' Showing of Practical Acceptance of the Area by the Prime Contractor.*

■ We believe that the determinative issue on this appeal is whether, prior to Mr. Becker's accident, Defendants had given up control of the mechanical room area, including the access opening, to Ward, the prime contractor for the project. If so, then the "acceptance rule" precludes recovery against Defendants by Plaintiffs. That rule is set out in section 384 of the Restatement (Second) of Torts, as follows:

> **§ 384. Liability of Persons Creating Artificial Conditions On Land on Behalf of Possessor for Physical Harm Caused While Work Remains in Their Charge**
>
> One who on behalf of the possessor of land erects a structure or creates any other condition on the land is subject to the same liability, and enjoys the same freedom from liability, as though he were the possessor of the land, for physical harm caused to others upon and outside of the land by the dangerous character of the structure or other condition while the work is in his charge.

Section 384 thus provides that a subcontractor is liable for physical harm caused by a dangerous condition or structure created by him while land is in his charge. Comment g to section 384 then states that the rule:

> does not apply to determine ... liability for harm caused after his charge and con-

trol of the work and his privilege to be upon the land for the purpose of accomplishing it is terminated in any manner. His charge and control is usually terminated by the possessor's acceptance of the completed work, but it may be terminated in a variety of other ways.

Plaintiffs and Defendants agree that Missouri has adopted the "acceptance rule," and has applied it numerous times over the last three decades. Missouri's rule is clearly set out in *Singleton v. Charlebois Constr. Co.,* 690 S.W.2d 845 (Mo.App.1985), as follows:

> After completion of the work by a contractor and acceptance by the owner [or prime contractor], the contractor is not liable for tortious conduct to third persons, but it is the owner's responsibility for maintaining a defective condition.[5]

*Id.* at 849. Perhaps not surprisingly, however, the parties differ as to whether Plaintiffs have presented evidence that the work done by Havens, on behalf of Havens and Setien, had not yet been accepted by the prime contractor Ward. More specifically, Plaintiffs contend that an actual acceptance is required in order to relieve a subcontractor from liability. They argue that there was no actual acceptance here, and that an implied acceptance based on the fact that Havens says it had completed its work is inadequate to constitute acceptance. This is particularly true, Plaintiffs say, where, as here, the hole had only been made within the 24 hours before Mr. Becker fell.

■ We disagree. We find that, for at least the last three decades, Missouri has held that a formal acceptance is not needed. To the contrary, a "practical acceptance" of the work of the subcontractor by the contractor or owner is all that is necessary in order to relieve the subcontractor of liability, and this may include an implied acceptance as well as an actual statement that "the work is accepted."

*Coleman v. City of Kansas City,* 859 S.W.2d 141, 146 (Mo.App.1993), explained what is meant by "practical acceptance" as follows:

The acceptance of the work that functions to relieve a contractor of liability to third persons is a practical acceptance after the completion of the work, and a formal acceptance is not essential. It is the control or right to control that the contractor has over the premises on which the work is being performed that renders the contractor liable to third persons. The occupation or resumption of possession of the worked premises by the owner amounts to resumption of control, and hence of liability for injury to others from defects caused by the negligence of the contractor.

*Coleman,* 859 S.W.2d at 146 (citations omitted).

This rule has been applied many times. Thus, for instance, in *Singleton,* 690 S.W.2d at 849–50, the plaintiff, a prospective home purchaser, was injured when a vertically stacked pile of sheetrock fell on him as he was inspecting the home while it was still under construction. The issue was whether Charlebois, the prime contractor, had accepted the sheetrock from Caudle, who had delivered it. *Id.* The evidence showed that Caudle had completed its work by delivering the sheetrock, which was to be hung by another subcontractor, and that the sheetrock had sat in the home for five days and had been seen by Charlebois' superintendent when he had, very briefly, inspected the home site. *Singleton* held that this was enough to constitute practical, if not formal, acceptance. *Id.*

*Pataky v. Mertens Constr. Co.,* 829 S.W.2d 38, 41 (Mo.App.1992), reaffirmed that acceptance need not be formal and can be implied. In that case, the contractor made what was called a "semi-final inspection" of Mertens' work. At the time of the inspection, verbal acceptance of the work was given and no corrections were ordered. The evidence showed that if no corrections are required, then persons in the field treat the semi-final inspection as a final inspection. And indeed, in *Pataky,* a written acceptance was issued one week later, based on the semi-final inspection. *Id.* However, in the intervening

---

5. The rule appears to have been first adopted in *Gruhalla v. George Moeller Constr. Co.,* 391 S.W.2d 585 (Mo.App.1965). It has also been applied in many other cases, a number of which are discussed in the following pages of this opinion.

week, plaintiff was injured at the site. *Pataky* held that the semi-final inspection and oral acceptance were sufficient to constitute acceptance and to relieve the subcontractor of responsibility for plaintiff's subsequent injury. *Id.*

■ We agree with Defendants that practical acceptance is shown on this record. As Defendants note, Havens had completed construction of the floor of the gymnasium mechanical room, it had no additional work to do on the room or floor, and neither it nor any other contractor was to put up a barricade or hatch or other cover over or around the opening in the floor, because the opening was to be a permanent part of the design so as to allow access to that little-used mechanical room high above the gymnasium. Equally importantly, the affidavits quoted above specifically state not just that Havens had completed its work, but also that the area "was turned over to the prime contractor to coordinate work with the other trades" and that control of the area was returned to the prime contractor prior to the accident in question.[6] While the affidavits do not specifically set out the words, "the area was accepted by the contractor," this is the necessary implication.

In the face of this evidence, Plaintiffs could not rely on their pleadings. They were obligated to come forward with some contrary evidence that Ward had not accepted the work. They neither offered such evidence nor filed a motion under Rule 74.04(f) for additional time in which to undertake discovery on this issue.

**B.** *A Subcontractor Will Not Be Held Liable After Acceptance Except In Special Circumstances Not Shown Here.*

■ Plaintiffs further argue that, even if Defendants prove below that the prime contractor accepted Havens' work, Havens and Setien should still be liable to Plaintiffs un-

der the principles set out in section 385 of the Restatement (Second) of Torts. Section 385 permits liability to be imposed on a subcontractor even *after* the subcontractor's work has been accepted "under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others." Restatement (Second) of Torts § 385 (1965).

We disagree. As this Court recently noted in *Coleman v. City of Kansas City*, 859 S.W.2d 141, 144–45 (Mo.App.1993), the Missouri Supreme Court specifically addressed the adoption of section 385 in *Gast v. Shell Oil Co.*, 819 S.W.2d 367 (Mo. banc 1991). There, as here, plaintiff argued that defendant subcontractor should be held liable even after acceptance if the contractor was negligent, just as a manufacturer is liable for injuries caused by his negligence even after it is sold by the retailer.

The Missouri Supreme Court disagreed. It did not totally reject section 385. It did say, however, that, even under Section 385, acceptance "is still a significant event." *Gast*, 819 S.W.2d at 371. The Court further said that Missouri had already recognized limited exceptions to the acceptance rule where policy and equity so required and that these exceptions appeared to correspond to many of the situations which would permit liability under section 385. For example, *Gast* noted, exceptions are recognized in situations in which "[1] the structure was so defectively constructed as to be essentially and imminently dangerous to the safety of others; [2] the defects are so hidden and concealed that a reasonably careful inspection would not have disclosed them, *and* these things are known to the Defendants but not to those who accept them" and where a departure from specifications could not be discovered by reasonable investigation. *Gast*, 819 S.W.2d at 370 (emphasis added). The Court said it saw no need to adopt further exceptions to the acceptance rule. As none of those exceptions were present in

---

**6.** We believe that plaintiffs must have overlooked these affidavits in arguing on appeal that Havens had offered no evidence that the prime contractor was even aware of the existence of the hole, much less that it had inspected the hole and determined to accept it. By stating that the

prime contractor was told the work was almost finished and that the work had been turned over to the prime contractor and control put back in it, the affidavits demonstrate a practical acceptance of it, comparable at least to the "semi-final" acceptance approved in *Pataky.*

*Gast,* the court affirmed a directed verdict for defendant.

We similarly do not find that the exceptions set out in *Gast* have any application here. As in *Gast,* Defendants' basic obligation was to follow the specifications in its contract and those specifications did not call for building a guard or barrier. Moreover, as in *Gast,* "[w]e cannot say that the specifications are 'so imperfect or improper that the ... contractor should realize that the work done thereunder will make the structure or condition unsafe....'" *Gast,* 819 S.W.2d at 371 (quoting Restatement (Second) of Torts § 384, cmt. f (1965)). To the extent that Plaintiffs ask us to adopt section 385 in situations other than the exceptional ones recognized in *Gast,* we decline to do so. We are bound to follow the Missouri Supreme Court on this issue. *See Coleman,* 859 S.W.2d at 144–45.

Even did we not believe that a practical acceptance was shown, or even had we found an exception to Section 384 or Section 385 to be applicable, however, we do not believe Plaintiffs would have a basis for recovery from Defendants. Plaintiffs first contend that the construction of the access opening without a barricade violated OSHA regulations. They contend that Defendants agreed by contract to take such safety precautions as were necessary or required by regulations, and that barricading or guarding the access opening fell within these duties.

We disagree. We do not find that the OSHA regulation is applicable. The regulation in question specifically states that it applies only to "temporary or emergency conditions where there is danger of employees or materials falling through floor, roof, or wall openings, or from stairways or runways." 29 C.F.R. § 1926.500(a) (1989). It then provides that temporary floor openings and ladderway floor openings shall have certain guards or barricades. However, it is undisputed that the access opening was not a temporary or emergency condition. It was permanent.[7] The regulation therefore is inapplicable. We find no other language in the contract which could be read to impose a duty on Defendants to barricade or guard the opening. Any such duty arose, if at all, under the common law.

■ Plaintiffs also contend that the jury could find that Defendants are liable under the common law for negligence because they should have anticipated that Mr. Becker or one of his co-workers would find it easier to stand on the finished metal flooring of the mechanical room, rather than on the scaffolding, to complete the smoothing of the side of the wall which faced that room.

Plaintiffs say that, if it was foreseeable that Mr. Becker would use the room for this purpose, then a duty arose on Defendants to prevent him or others from falling in the hole. It was up to the jury to decide whether the Defendant met this duty by warning Plaintiffs about the hole or whether Defendants were also obligated to guard or cover the hole because they should have foreseen that Mr. Becker might forget about the hole and step into it due to his concentration on his work.

In support, Plaintiffs cite to cases such as *Cox v. J.C. Penney Co.,* 741 S.W.2d 28 (Mo. banc 1987). Plaintiff in *Cox* was injured when she tripped over a luggage strap which she claimed extended into the aisle in which she was walking in the Penney's store. She argued that she should not be required to prove that she had not seen the strap and that whether she knew about or should have seen the strap was simply an issue of comparative fault for the jury to determine. The Supreme Court agreed. It held that it was up to the jury to balance plaintiff's fault against defendant's duty to maintain the

---

7. While one of the mechanical drawings states "floor hatch ... area" where the access opening is to be, and while plaintiffs claim this meant that a hatch was to be built over the access opening, it is undisputed that in fact as finished the opening has no hatch, the room's architectural and structural drawings showed an opening without any guard, hatch or barricade, defendants' contract did not call for building any guard, hatch or barricade, and neither did anyone else's, at least so far as is shown by the record. Thus, whatever the mechanical drawing may have shown, we do not believe there is a *genuine* issue as to whether the opening was permanent in nature.

premises in a reasonably safe condition. *Id.* at 30.

*Cox* was followed by the Southern District in *Williamson v. Cox,* 844 S.W.2d 95, 97–98 (Mo.App.1992). *Williamson* was similar to the instant case in that Mr. Williamson fell through an opening in the roof of a building under construction. The opening had been cut by an employee of another subcontractor so that an air conditioner could be placed in the opening. As the employee was still in the process of building an 18 inch high curb around the opening, it began to rain. The general contractor ordered various employees, including plaintiff, to cover the roof with plastic sheeting to prevent water from pouring through it onto the newly poured concrete of the floor below. The subcontractor's employee thus quit building the curbing and moved out of the way. Plaintiff helped to cover the roof with big plastic sheets, and then began to assist two other employees to put a big piece of metal over the hole. As he tried to do so he stepped into the hole, falling some 20 feet and sustaining the injuries for which he sued.

Defendant argued it had no duty to make the roof safe or give a warning because the dangerousness of the condition was "open and obvious to the Plaintiff." The court disagreed, stating that:

> If plaintiff was aware of the opening, that does not prevent his claim from being submitted to the jury. Cases relied on by appellant indicating to the contrary were previous to *Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983), as applied in *Cox v. J.C. Penney Co.,* 741 S.W.2d 28 (Mo. banc 1987). Since those decisions a plaintiff's knowledge of the danger is considered in determining his comparative negligence rather than in determining the duty of defendant.

*Williamson,* 844 S.W.2d at 98.

*Williamson* then affirmed judgment for plaintiff, stating that the jury could find that the subcontractor's employee "before he left the area should have taken steps to cover, barricade or warn those on the roof, or re-quest of the general contractor's assistant supervisor that this be done before the opening was covered with plastic." *Williamson,* 844 S.W.2d at 97–98.

This case is distinguishable from *Williamson* in important ways. In that case, the roof opening was created in a common work area and the employee who created it clearly knew that others would be working around the hole, that they might not be able to see where the hole was and that they might not be able to protect themselves from falling through it.[8] Here, the only evidence was that Mr. Becker was aware of the hole and of the fact that nothing was covering it and that he chose to work near it voluntarily, only once Defendants' employees had left the area and only after they had warned him about the presence of the hole. In this situation, it is little more than speculation to suggest that Defendant should have anticipated that Mr. Becker would ignore his warning and would work in the room despite the presence of the hole and without himself guarding it.

In any event, we believe the controlling law is not *Cox* or *Williamson,* but rather the Missouri Supreme Court's decision in *Harris v. Niehaus,* 857 S.W.2d 222 (Mo. banc 1993). In *Harris,* decided after both *Cox* and *Williamson,* Plaintiff left her car parked on a very steep hill, with her three young children inside, while she momentarily went into a home under construction on business. Tragically, while she was inside, the car rolled down the hill into a lake and all three children drowned. Plaintiff sued the subdivision trustees, alleging they should have warned about the danger of parking on the hill. The jury found plaintiff 90% at fault and defendant subdivision 10% at fault.

On appeal, the Missouri Supreme Court reversed, holding that, as a matter of law, Defendants owed no duty to plaintiff. It held that the liability of a possessor of land to an invitee like Mrs. Harris is governed by the rule set out in section 343 of the Restatement (Second) of Torts. That section states

---

8. *See Killian v. Wheeloc Eng'g Co.,* 350 S.W.2d 759 (Mo.1961) (creation of danger in common work area can provide basis for duty).

in relevant part that a possessor of land is liable only if the possessor:

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343 (1965). The Supreme Court found that Mrs. Harris had failed to prove element (b) of section 343, for she had failed to show that defendants should have expected that plaintiff would "not discover or realize the danger or [would] fail to protect themselves against it." The Court explained its rationale as follows:

> [W]hen the dangerous condition is so open and obvious that the invitee should reasonably be expected to discover it and realize the danger, a possessor of land does *not* breach the standard of care owed to invitees 'unless the possessor should anticipate the harm despite such knowledge or obviousness.'

*Harris,* 857 S.W.2d at 226.

The *Harris* plaintiff argued that in so holding the Supreme Court was ignoring the rule set out in *Cox* that the openness and obviousness of the danger should not preclude liability, but rather should simply be a factor for the jury to consider in determining comparative fault. *Harris specifically rejected* this argument. While it did not directly overrule *Cox,* it held that "more crisp analysis in *Cox*" would have recognized that *before* one reaches the issue of comparative fault, one still must determine whether a duty exists at all, stating:

> *Cox* did not intend to abrogate the open and obviousness of a condition as a consideration for the court in determining a possessor of land's standard of care. Quite simply, *where the danger is open and obvious as a matter of law and the risk of harm exists only if the plaintiff fails to exercise due care, the case is not submissible to the jury—and the dilemma resolved in Cox is never reached.*

*Harris,* 857 S.W.2d at 227 (emphasis added).

We believe that *Harris* is controlling here, for, as in *Harris,* Plaintiffs have failed to make out a case on the second element of section 343. That is, there was no evidence from which the jury could find that Defendants should have expected that persons such as Mr. Becker "will not discover or realize the danger, or will fail to protect themselves against it." Restatement (Second) of Torts § 343 (1965).

While Plaintiffs suggest that Defendants could anticipate that Mr. Becker might decide to work inside the room and then might become so involved in his work he would forget about the hole, these events only became foreseeable in hindsight, just as the likelihood that Mrs. Harris would leave her children in a car parked on a steep hill above a lake only became apparent in hindsight.

At the time of the accident in this case, as Mr. Becker candidly admits, he was aware of the presence of the hole, as he was working on the wall next to it as the hole was made. He also admits that he did not need to stand in the room where the hole was in order to construct the wall, and that he had not done so while defendants' employees were present, and that, even after he began working in the room, he was aware of and stepped around the hole. Moreover, when he fell, it was not because he forgot about the hole, but because he thought it was farther down the wall and just did not look to see.

While we certainly agree that this fall was tragic, and while under pre–*Harris* law we would find it a closer question, it is evident that the danger of the hole was open and obvious and the risk arose only because Mr. Becker failed to exercise due care and only because Mr. Becker failed to heed the specific warning given by Mr. Dietrich about the very danger which occurred. In this situation, *Harris* requires us to find that no further duty to Mr. Becker was owed by Defendants.

Summary judgment for Defendants is affirmed.

**All concur.**