C. Russell GOULD, Plaintiff,

v.

UNITED STATES of America, Defendant.

William R. ZANETELLO, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 96–0965–CV–W–3.

United States District Court,
W.D. Missouri,
Western Division.

Feb. 26, 1998.

Michael B. White, Kansas City, MO, for C. Russell Gould.

William L. Meiners, James C. Bohling, U.S. Attorney's Office, Kansas City, MO, for U.S.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SMITH, District Judge.

A bench trial in the above-captioned matter was held on December 27 and 28, 1997. The following constitutes the Court's Findings of Fact and Conclusions of Law. All legal conclusions found in the Findings of Fact should be treated as legal conclusions; similarly, all factual determinations found in the Conclusions of Law should be treated as factual findings.

### I. Findings of Fact

1. Longview Lake is an artificial lake located in Jackson County, Missouri, immediately south of Interstate 435 at Longview Road. The area surrounding the lake is maintained as a recreational area by Jackson County, Missouri, with the exception of an earthen Dam structure (the "Dam") located at 109th Street (a portion of 109th Street runs over the Dam). The Dam is owned and maintained by the United States Army Corps of Engineers ("the Corps").

2. Construction of Longview Lake was completed in 1985. Prior to 1988, public access to both the upstream and downstream sides of the Dam was restricted. In response to a Congressional inquiry, access restrictions to both sides of the Dam were removed in 1988.

3. In the early 1990s, significant snowfalls occurred and people came to the Dam to sled down the back, or land, side. At that time, signs were posted on the Dam indicating that access to the Dam was restricted. Nonetheless, Corps personnel became aware that people were sledding on the back side of the Dam and decided to allow sledding to continue. The restriction signs either fell down and were not replaced, or were removed from the Dam, sometime before 1996. On January 26 and 27, 1997, there were no signs warning the general public against sledding on, or otherwise restricting general public access to, the back of the Dam.

4. The back side of the Dam abuts the shoulder of 109th Street and begins to slope downward at that point. One Hundred Ninth Street is a four lane road with a broad paved shoulder. The portion of the street that crosses the Dam is marked as "No Parking." Despite that restriction, when people come to the Dam to sled they typically park their cars along the shoulder on both sides of 109th Street, and on another roadway which intersects with 109th Street next to the Dam. Jackson County park rangers did not enforce the posted parking restrictions when sledding took place on the Dam.

5. A guard rail runs along the shoulder of 109th Street directly above the back side of the Dam. Below the guard rail, the Dam runs at a 3 to 1 slope until a little under halfway down the hill. At that point, a terrace runs across the face of the Dam. The terrace is a grassy mound of earth approximately three to four feet high at its crest. The purpose of the terrace is to control erosion. Beyond this first terrace, the hill continues downward at a 5 to 1 slope until it reaches a second terrace, which runs across the face of the Dam near the bottom of the hill.

6. Placed at regular intervals along the back side of the Dam are instruments used by the Corps in the operation of the Dam. These include pizometers (which are round white poles which extend approximately five feet above the ground) and alignment monuments (round structures approximately one foot to eighteen inches in diameter and one foot in height). Every individual pizometer and alignment monument was marked and protected by metal fence posts, yellow in color. The purpose of these fence posts was to protect the instruments from lawnmowers. These instruments were placed at regular intervals along the hill in such a way that sledders typically chose to sled in the "lanes" between the instruments. (This does not imply that this purpose dictated the placement of the instruments; the placement of the instruments in this manner is necessary for the management of the Dam, and the sledders' decision to sled between them was

a coincidental and independent safety and/or recreational decision.)

7. Prior to January 26, 1996, and in separate incidents, at least three individuals had been injured severely enough while snow sledding on the back of the Dam to require transportation by ambulance to a hospital. There is no evidence as to the extent of their injuries.

8. As of January 26, 1996, the Corp had actual knowledge of the three incidents described in the above paragraph. However, the information available to the Corp did not indicate that all of the incidents involved a sledder being "launched" to a tremendous height off the first terrace. In January 1995, James Westbrook was injured "after jumping the uppermost ridge while sledding," but no indication of height was indicated. Pl.Ex. 31. Also in January 1995, Robin Guentert was injured while sledding, but the evidence does not indicate what details of the accident, if any, were conveyed to the Corp. Pl.Ex. 30. In February 1993, Roger Calinks "was sled[d]ing down the downstream side of Longview Dam and fell, injuring his neck." Pl.Ex. 29. There is no indication that Calinks "fell" as a result of jumping over the first terrace, much less any indication that the Corp was aware of any such fact. In addition, none of these reports indicate that the sledders' inability to see the terraces contributed to their accidents.

9. Plaintiff William Zanetello has lived in the Kansas City area for many years and is generally familiar with the Longview Lake area. He is also aware of the presence of the terraces on the Dam, as he has seen them in dry conditions. He is also aware of the presence of the pizometers and posts warning of the presence of alignment monuments.

10. On January 26, 1996 (a Friday), school was canceled due to inclement weather, and Zanetello drove with his stepson and his wife's niece to the Dam so they could go sledding. As they pulled up to park, Zanetello warned the children about "poles" on the face of the Dam. As the group prepared to sled, it was sleeting and foggy, and the back side of the Dam was icy.

11. Zanetello (and, for that matter, the children) had gone sledding before but never down the back side of the Dam. Zanetello had, in the past, stopped his car on 109th Street to watch other people sled down the Dam. On those occasions when he stopped to observe people sledding he saw some of the sledders become airborne.

12. Before they began sledding, Zanetello and the children observed two other people either skiing or snowboarding on the Dam. The other people performed acrobatic maneuvers using the first terrace as a launching point.

13. Zanetello noticed "little terraces" on the back side of the Dam and in the path he intended to take.

14. The children sledded down the hill before Zanetello, and they completed their run without incident. As Zanetello positioned himself at the top of the slope to follow them, he saw the fenceposts protecting the pizometers and alignment monuments. He attempted to position himself in such a way that he would avoid these obstacles.

15. Zanetello rode down the hill in a plastic "saucer". The saucer had no handle or other device that would permit Zanetello to hold on to the saucer as he went down the hill, and he rode in the saucer in a seated position. However, when he went down the hill he did so at an angle, and he went over the first terrace at an angle. After passing over the first terrace, Zanetello became airborne and struck a fencepost when he landed.

15. Zanetello sustained a variety of injuries, including a pulmonary contusion, fractured ribs, and fractures in his back. He was lifted up the hill by paramedics and eventually taken to Baptist Medical Center for treatment of his injuries.

16. A local television station aired a report about Zanetello's accident on the news that evening. A copy of the report was entered into evidence. The video confirms that the Dam was covered with more ice than snow. Upon reviewing the tape, the Court is able to discern the existence and location of the first terrace. There is no evidence that any of the Defendant's agents saw the news report or otherwise learned of Zanetello's accident before the following Monday. (The Park Manager did not learn of Zanetello's or Gould's accidents until the following Monday or Tuesday).

17. Plaintiff C. Russell Gould had lived in the Kansas City area for many years and was generally familiar with the Longview Lake area. On the morning of January 27, 1996, Gould discussed going sledding with his son, his neighbor, and his neighbor's son.

18. Conditions on January 27, 1996 were about the same as they were the day before (when Zanetello was injured). There was less wind and no fog. However, the ground was still very icy.

19. There was a large group of people sledding on the Dam, so Gould and his companions had to park on a side street that ran next to the Dam. As the group walked down the side road to 109th Street, people could be observed sledding down the hill. Many of the sledders left the ground after going over the first terrace. The sledders who did this often yelled or screamed.

20. Despite Gould's testimony to the contrary, the Court believes that as Gould walked from his car to the site from which he eventually started to sled, he observed the other sledders.

21. The terraces were visible from the top of the Dam. This is inferred from the fact that they were visible from the top of the Dam on January 26 and conditions on January 27 were similar to (or slightly better than) those present the day before. This fact is also supported by testimony from the neighbor who accompanied Gould on January 27 and the Park Ranger who observed them the following Monday or Tuesday.

22. Gould (and, for that matter, the other people with him that day) had gone sledding before but never down the back side of the Dam. Before January 27, Gould had never had occasion to look down the back side of the Dam.

23. Gould watched his neighbor, and then his neighbor's son, go down the hill. The neighbor became airborne as he went over the terrace.

24. Gould saw the terrace, which he described at trial as "a little speed bump." He also saw the posts and alignment markers.

25. Gould and his son rode together down the hill on a long, plastic, toboggan-style sled. Both Gould and his son were seated in (as opposed to lying down on) the toboggan. Gould held on to the guard rail as the two of them mounted the sled. Gould then let go of the guard rail and the sled started down the hill. The sled gained speed and went straight over the first terrace. As a result of going over the terrace, the sled lost contact with the ground and flew a number of feet through the air. When Gould hit the ground he sustained a burst fracture of a vertebra. Gould's son landed unhurt. Gould was taken by ambulance to St. Joseph Hospital.

26. The Dam's manager, who has worked at the Dam since it began operating, has never seen the first terrace so completely covered with snow and/or ice so as to be completely obscured from view.

## II. Conclusions of Law

This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80, and the Plaintiffs have exhausted their administrative remedies by filing a claim for damage, injury or death with the Corp on February 28, 1996 (Zanetello) and March 1, 1996 (Gould). The Corp has not granted either claim and more than six months elapsed between the filing of these claims and the filing of these lawsuits, thus conferring jurisdiction on this Court. 28 U.S.C. § 2675. Venue is also proper in this judicial district. 28 U.S.C. § 1402.

The Court agrees with the parties that Missouri law governs this dispute and that under Missouri law the Plaintiffs were licensees. Their characterization as licensees (as opposed to invitees) is significant. In *Wells v. Goforth*, 443 S.W.2d 155 (Mo.1969) (en banc), the Missouri Supreme Court specifically declined to adopt the Second Restatement of Torts ("Second Restatement") to the extent that it defined a landowner's obligations to licensees. The Second Restatement, in section 342, imposes liability if "the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to" licensees. The supreme court rejected this formulation because it did "not believe a possessor of land should be subject to liability for bodily harm caused to gratuitous licensees by a natural or artificial condition thereon unless the possessor is himself aware of the condition." 443 S.W.2d at 158. Instead,

the court adopted the formulation contained in the First Restatement of Torts ("First Restatement"). Although *Wells* has been overruled on other grounds, its adoption of the First Restatement and rejection of the Second Restatement with respect to duties owed to licensees remains valid in Missouri. *E.g., Kasal v. Freihaut,* 860 S.W.2d 24, 25 (Mo.Ct.App.1993); *Vogt v. Dace,* 762 S.W.2d 838, 841 (Mo.Ct.App.1988); *Birdsong v. Adolf,* 724 S.W.2d 731, 733 (Mo.Ct.App.1987).

Under the First Restatement.

A possessor of land is subject to liability for bodily harm caused to gratuitous licensees by a natural or artificial condition thereon if, but only if, he

    (a) knows of the condition and realizes that it involves an unreasonable risk to them and has reason to believe that they will not discover the condition or realize the risk, and

    (b) invites or permits them to remain upon the land, without exercising reasonable care

    (i) to make the condition reasonably safe, or

    (ii) to warn them of the condition and the risk involved therein.

Restatement (First) of Torts § 342 (1934); *see also Vogt,* 762 S.W.2d at 841 (quoting First Restatement); *Birdsong,* 724 S.W.2d at 733 (same). Plaintiffs have offered the following explanation to describe the condition and associated risk that the Corp was obligated to warn them about:

The dangerous condition encountered by the Plaintiffs—the condition responsible for their injuries—was the uppermost terrace.... The specific risk at issue in this case was that while sledding down the hill, a person could get launched up to six feet into the air and be severely injured upon landing, depending upon exactly where he hit the uppermost terrace.

Plaintiffs' Post Trial Brief at 7–8. Upon considering this contention in light of Mis-

souri law, the Court concludes that Defendant owed no duty to Plaintiffs in the circumstances of this case.

Comment b to section 342 of the First Restatement declares, in pertinent part, that "[i]f the licensees are adults, the fact that the condition is obvious is usually sufficient to apprise them, as fully as the possessor, of the full extent of the risk involved in it." In such a circumstance, the obviousness of the danger (and the knowledge of the risk imputed by this comment) negates the requirement that the landowner have reason to believe that the licensee will not discover the condition or risk, thereby eliminating the landowner's duty to warn or make safe. *See also* Restatement (First) Torts § 340 (1934) (and comment e thereto).

Missouri courts agree with this analysis. In *Birdsong,* the plaintiff jumped off a 70–foot high bluff into the Lake of the Ozarks and suffered serious injuries. In holding that the possessor of the land[1] could not be liable as a matter of law, the Missouri Court of Appeals assumed for the sake of argument that the plaintiff was a licensee and held in part that there was no evidence that the possessor "had reason to believe that a gratuitous licensee would not discover the condition or realize the risk. The condition was open and obvious, a 70–foot bluff lined with trees, dropping to the lake below. Missouri courts have held that a possessor of land is under no duty to protect even invitees or children from dangerous conditions which are open and obvious." 724 S.W.2d at 734.

Further support can be found in Missouri cases discussing invitees. Not only is "[t]he standard of care owed an invitee is generally higher than that owed a licensee," *Harris v. Niehaus,* 857 S.W.2d 222, 225 (Mo.1993) (en banc), but a duty to invitees depends, in part, on determining whether the possessor should expect that invitees will not discover the danger or will fail to protect themselves against it.[2] In *Harris,* the Missouri Su-

---

**1.** This awkward term is used because the possessor was a lessee and not the owner. Henceforth, the term "landowner" is used interchangeably with the phrase "possessor of the land."

**2.** Section 343 of the Second Restatement (which is an accurate statement of Missouri law with respect to invitees, *see, e.g., Harris,* 857 S.W.2d at

225–26), provides for liability to invitees if, *inter alia,* the possessor should expect that invitees "will not discover or realize the danger or will fail to protect themselves against it," which is similar to the element at issue with respect to licensees. Thus, both section 342 of the First Restatement and section 343 of the Second Re-

preme Court determined the plaintiff's case foundered on this very element, 857 S.W.2d at 226. The plaintiff had left her children in a car parked on an inclined driveway; tragically, the car rolled down the driveway into a lake, resulting in the deaths of her children. The supreme court held that the condition was open and obvious, saying in part that the fact that the road sloped toward the lake was obvious to anyone who observed it. *Id.* In *Fisher v. Northmoor United Methodist Church,* 679 S.W.2d 305 (Mo.Ct.App.1984), the plaintiff was struck by a ladder that he had helped put into position. He alleged that the land owner was liable because the ladder was not tied to the building. In holding that the landowner could not be held liable, the Court of Appeals first noted that the plaintiff had actual knowledge that the ladder was not tied. The court then held that even if plaintiff did not have this actual knowledge, "knowledge was available to be acquired. The fact that the ladder was unsecured and, hence, capable of dislodgement by any of a variety of forces was open, obvious and ascertainable by the most casual observation. The reasonable expectation was that invitees on the premises would discover that which was apparent and obvious to those who exercised ordinary care as to their surroundings." 679 S.W.2d at 307. In *Hellmann v. Droege's Super Market, Inc.,* 943 S.W.2d 655 (Mo.Ct.App.1997) (en banc), the Missouri Court of Appeals held the fact that a grocery store's icy parking lot was icy was open and obvious. 943 S.W.2d at 658. Finally, in *Peterson v. Summit Fitness, Inc.,* 920 S.W.2d 928 (Mo.Ct.App.1996), the plaintiff was swimming in a rectangular swimming pool that sat four feet off the floor. A deck surrounded three sides of the pool, leaving the remaining side unprotected. The unprotected side had no railing, platform or other protective device; instead, there was only a four foot wall, approximately one foot wide, extending to the concrete floor below. Plaintiff climbed out of the pool on the unprotected side with her eyes closed (to avoid getting chlorine in them), forgot which side she had climbed out on, and fell four feet to the floor

below. Observing that "[a] condition is open and obvious if invitees should reasonably be expected to discover it," the court of appeals held that the condition of the pool was open and obvious because "anyone entering the room which housed the pool saw the pool from the side which had the exposed wall. The wall stretched some thirty feet and rose four feet off the ground. Summit Fitness could reasonably expect its invitees to discover this condition." 920 S.W.2d at 933.

Plaintiffs contend that the fact that a condition is open and obvious is relevant only to comparative fault and has no role in determining whether Defendant had a duty. Plaintiffs' interpretation of Missouri law is mistaken. *E.g., Harris,* 857 S.W.2d at 227 ("*Cox [v. J.C. Penney Co.,* 741 S.W.2d 28 (Mo.1987) (en banc)] did not intend to abrogate the open and obviousness of a condition as a consideration for the court in determining a possessor of land's standard of care. Quite simply, where the danger is open and obvious as a matter of law and the risk of harm exists only if the plaintiff fails to exercise due care, the case is not submissible to the jury . . . ."); *Becker v. Setien,* 904 S.W.2d 338, 348 (Mo.Ct.App.1995). Indeed, if Plaintiffs' argument were correct, there is no way that *Harris, Fisher* or *Becker* could have resulted in judgments in the defendants' favor (or that *Birdsong* could have concluded with the issuance of a writ of prohibition) given that all were decided after Missouri replaced contributory negligence with comparative fault.[3]

It is true that, in some cases, the issue of the plaintiff's comparative fault is an issue for the jury's consideration. For instance in *Hellmann,* after determining that the icy parking lot was open and obvious, the court of appeals held that the next issue was whether the possessor of the land should have anticipated the harm despite the danger's obviousness. 943 S.W.2d at 658. Similarly, in *Peterson* (a case relied upon by Plaintiffs), after determining that the pool's condition was open and obvious, the court of

statement require consideration of whether a condition is open and obvious; therefore, prior Missouri cases discussing this issue with respect to invitees are instructive in this case.

**3.** Missouri adopted comparative fault when the supreme court decided *Gustafson v. Benda,* 661 S.W.2d 11 (Mo.1983) (en banc).

appeals held that the next issue was "whether Summit Fitness should have anticipated the harm despite the obvious condition of the wall." 920 S.W.2d at 933. These holdings were made possible because the plaintiffs in *Hellmann* and *Peterson* were invitees—not licensees, as are the Plaintiffs in this case. This distinction is significant because these aspects of *Hellmann* and *Peterson* are based on section 343A of the Second Restatement, which states in pertinent part as follows:

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*

(emphasis supplied); *see Harris,* 857 S.W.2d at 226 (adopting this portion of section 343A); *Hellmann,* 943 S.W.2d at 658–59 (relying on section 343A). Thus, under the Second Restatement (which serves as Missouri law in the context of invitees), a landowner can be liable even if the danger encountered by his invitee was open and obvious *if* the landowner should have anticipated the harm occurring despite that fact. However, under the First Restatement (which serves as Missouri law in the context of licensees), there is no provision holding landowners liable for open and obvious dangers even if the landowner

should expect that the licensee will encounter the harm.[4] In light of the cases holding that landowners owed no duty to licensees and invitees when the danger was open and obvious, and in light of those other cases (*Hellmann* and *Peterson*) that discuss the concept of open and obvious dangers, the Court concludes that Defendant owes no duty (and therefore cannot be held liable) if the danger or risk was open and obvious.

■. With that understanding, the Court concludes that Defendant owed no duty to Plaintiffs because the danger was open and obvious.[5] To the extent Plaintiffs contend that the "danger" was the presence of the first terrace, the Court finds that Zanetello knew of its existence because he saw it there in the summer and because he saw it on the day of his accident. As for Gould, the Court does not accept his testimony that he did not know the terrace was there. This conclusion is based on the testimony of other people who were there (notably, Gould's neighbor), the videotape taken the day before, and Gould's admission. Even so, as in *Fisher,* information indicating the terrace's presence was readily available (and, in the Court's opinion, actually observed by Gould) in the fact that numerous other sledders were on the backside of the Dam, and many were becoming airborne after hitting the first terrace. Furthermore, Gould watched his

4. This point is also supported by Restatement (First) of Torts § 342 cmt. c, illus. 1 (1934). In this illustration, the landowner owed no duty to warn about a bad road because the condition was open and obvious. The fact that liability may have been cut off because the driver was contributorily negligent was irrelevant; the issue did not have to be reached because the road's condition was open and obvious. Of course, Missouri uses comparative fault instead of contributory negligence, but the principle is the same precisely because the former replaced the latter. Thus, in this illustration, there would have been no need to compare the landowner's fault to the driver's fault; no duty was owed because the condition was open and obvious.

5. In reaching this conclusion the Court has considered, over Defendant's objection, evidence of subsequent remedial measures. *See Pitasi v. Stratton Corp.,* 968 F.2d 1558, 1560–61 (2d Cir. 1992) (citing cases from Third and Tenth Circuits). However, this evidence does not persuade the Court that the condition was not open and obvious. The record demonstrates multiple reasons for restricting access to the back slope of

the Dam, some of which have nothing to do with injuries to sledders. Moreover, although injuries to sledders were a factor in the decision to post signs on the Dam, there is no indication that this factor was predicated on any particular hazard or danger at the Dam; it appears that the desire to prevent injuries was of a general nature and arose simply because injuries occurred (as one might expect in sledding at any location) as opposed to a concern that a particular hazard was hidden from view and unknowingly encountered by sledders

Defendant's argument that this evidence is barred by the discretionary function exception is rejected. The discretionary function exception, generally speaking, prevents liability when the government makes a purely discretionary decision. In this case, it may be true that failing to follow the Corp's sign regulations was a discretionary decision—but the point is moot because Plaintiffs are not asserting liability for the Corp's failure to follow its regulations. When this issue was discussed during trial, Defendant agreed to address the topic in its post-trial brief, but did not do so. Therefore, this objection is rejected.

neighbor's run down the hill, and his neighbor became airborne after hitting the first terrace.

■ To the extent that Plaintiffs seek to augment their argument by claiming the first terrace was harder to see than might be expected due to unusual weather conditions,[6] their claim must fail because there was no evidence that Defendant had actual knowledge that unusual weather conditions had partially obscured the terrace. Knowledge about the weather conditions generally would, at best, support an argument that Defendant should have known what the terrace would look like, but this is the sort of argument that *Wells* specifically sought to avoid in electing the First Restatement over the Second Restatement.[7]

Plaintiffs also argue that they could not have known that sledding over the terrace would cause them to become airborne. Plaintiffs have sledded in the past, and common experience in sledding suggests that sledding over a hill, mound, or similar terrain has a tendency to cause the sledder to go into the air. Common sledding experience also suggests that no sledding path—particularly at a school, which is where Plaintiffs sledded in the past—is so perfectly even that it is devoid of rocks, bumps and other topographical features, and that Plaintiffs never before knew that sledding over a mound or hill might cause them to become airborne. The Court simply does not believe the Plaintiffs did not know that sledding over a small hill on an icy slope is accompanied by a risk that the sled and its occupants will become airborne. "The licensee is ... entitled to nothing more than knowledge of the actual conditions, which he will encounter if he avails himself of the possessor's consent if he knows the actual conditions, he has an opportunity to exercise an intelligent choice as to whether the advantage to be gained from his entry is sufficient to justify him in incurring

the risk which he knows is inseparable from it." Restatement (First) of Torts § 340 cmt. e (1934).

■ Finally, in a further description of "the risk," Plaintiffs contend that they did not know there was a risk that they would fly six feet into the air and become severely injured. There is no doubt that Plaintiffs never contemplated that they could achieve such a height, or that they could suffer injuries as severe and extensive as they have received; however, neither could the Defendant. Evidence in the record contains partial details of three prior accidents. Calinks was injured when he "fell;" there is no indication that he fell after sledding over the terrace and achieving a height of six feet. There is also no indication as to the extent of his injuries, which is important in evaluating "the risk." Restatement (First) of Torts § 340 cmt. b (1934) (" 'knowledge' of the risk involved in a particular condition implies not only that the condition is recognized as dangerous but also that the chance of harm and the gravity of the threatened harm are appreciated.") Guentert was injured while sledding, but there are no details as to how he got hurt. The report of Westbrook's injury indicated that it occurred when he jumped over the first terrace, but there is no indication as to how high he jumped or the extent of his injuries. Plaintiffs have not proven Defendant had actual knowledge (as required by the First Restatement) that any particular condition on the backside of the Dam involved an *unreasonable* risk of harm. The mere fact that three people got hurt to unspecified degrees in unspecified ways while sledding (which is, after all, an activity in which people routinely get hurt) does not suffice. *Cf. Kasal,* 860 S.W.2d at 25 ("Moreover, even assuming defendant's knowledge that the swingset was unanchored, the record is devoid of any evidence or inference that

---

6. The Court agrees that the terrace was partially obscured by the manner in which the wind had blown the snow and ice against the terrace. However, the Court finds that the terrace was still capable of being observed by someone standing at the top of the Dam, preparing to sled down and was actually observed by Plaintiffs.

7. Plaintiffs' Exhibit 36 is a typewritten memo that contains a handwritten note by an unidenti-

fied individual. The handwritten note suggests that the terrace had, at some unspecified time in the past, become covered with snow—but this could be a reference to the incidents involving the Plaintiffs. In any event, the author remains anonymous, creating both authenticity and hearsay problems. Accordingly, the handwritten portion of this exhibit is excluded from evidence.

defendant knew such condition involved an unreasonable risk.").

### III. Conclusion

The terrace's presence on the back slope of the Dam was open and obvious, as was the risk that someone sledding down the icy slope and over the terrace might become airborne. Therefore, Defendant had no duty to warn Plaintiffs of either the terrace's presence or the risk that sledding over it might cause them to fly through the air. Even if (contrary to the Court's finding) the terrace was covered with snow and ice so as to be undetectable on January 26 and 27, 1996, there is no evidence that Defendant had actual knowledge of this fact so, under Missouri law, it owed no duty to its licensees. Furthermore, there is no evidence that Defendant had actual knowledge that the terrace (and the associated risk of becoming airborne while sledding over it) posed an unreasonable risk of serious injury. For these reasons, Defendant owed no duty to Plaintiffs, and judgment should be entered in Defendant's favor.

IT IS SO ORDERED.